## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DALE F. COOK and TAMMY LYNN     )
COOK, individually and upon     )
the relation of the State of    )
North Carolina,                 )
                                )
        Plaintiffs,             )
                                )
            v.                  )          1:11CV24
                                )
BRAD RILEY, individually        )
and in his official capacity    )
as Sheriff of Cabarrus          )
County, North Carolina;         )
JASON THOMAS, individually      )
and in his official capacity    )
as Deputy Sheriff of            )
Cabarrus County;                )
ROBERT WENSIL, individually     )
and in his official capacity    )
as Deputy Sheriff of            )
Cabarrus County; and            )
PENNSYLVANIA NATIONAL           )
MUTUAL CASUALTY INSURANCE       )
COMPANY, a corporation, in      )
its capacity as Surety on       )
the official bond of            )
the Sheriff of Cabarrus         )
County,                         )
                                )
        Defendants.             )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The instant case comes before the undersigned United States

Magistrate Judge for a recommended ruling on Defendants' Motion for

Summary Judgment (Docket Entry 34). (See Docket Entries dated Jan.

24, 2011, Jan. 24, 2011, and April 19, 2012 (designating case as

subject to handling pursuant to this Court's Amended Standing Order

No. 30, assigning case to undersigned Magistrate Judge, and referring instant Motion to same, respectively).)[1] For the reasons that follow, the Court should deny the instant Motion.

## I. Background

This case arises from Defendant Cabarrus County Deputy Sheriff Jason Thomas's deployment of a TASER against Plaintiff Dale Cook. (See Docket Entry 1, ¶¶ 12-74.) The Parties agree that, after a marital dispute in which Mr. Cook pushed his wife, Plaintiff Tammy Lynn Cook, she swore out a warrant for his arrest. (Docket Entry 35 at 2; Docket Entry 46 at 3.) In addition, the Parties agree that Deputy Thomas and Defendant Sergeant Robert Wensil (also of the Cabarrus County Sheriff's Office) went to the home of the Cooks to serve the arrest warrant. (Docket Entry 35 at 2; Docket Entry 46 at 4.) The Parties also agree that, prior to the arrival of Deputy Thomas and Sergeant Wensil, Mr. Cook climbed into a tree stand behind his house and sat down. (Id.) The Parties' accounts of the encounter that followed, however, differ in many respects. (Compare Docket Entry 35 at 3-5, with Docket Entry 46 at 4-7.)

According to Mr. Cook, "[w]hen the officers asked him to come down [from the tree stand], [he] replied, 'Well, right now, I would

_____

[1] Under said Standing Order, "[t]he magistrate judge to whom the case is assigned will rule or make recommendations upon all motions, both non-dispositive and dispositive." M.D.N.C. Amended Standing Order No. 30, ¶ 2; see also M.D.N.C. LR72.2 ("Duties and cases may be assigned or referred to a Magistrate Judge . . . by the clerk in compliance with standing orders . . . .").

-2-

rather not. I need some space.'" (Docket Entry 46 at 5 (quoting Docket Entry 42 at 93).) This same general line of request and response recurred several times. (Id. (citing Docket Entry 42 at 93-94).) Deputy Thomas then drew his X-26 TASER gun and "leaned over to Sergeant Wensil and said, 'Taser?' And, Wensil replied, '[t]hat may be our only option.'" (Id. (quoting Docket Entry 56 at 50).) Without warning, Deputy Thomas then discharged his TASER at Mr. Cook. (Id. at 6 (citing Docket Entry 42 at 133).)

The Cooks further assert that, as a result of the TASER shock, Mr. Cook's "arms shot out from his body and his head turned from side to side." (Id. (citing Docket Entry 42 at 96-97).) He then fell from the tree stand, a fifteen foot drop, landing on his back. (Id. at 7 (citing Docket Entry 45 at 41; Docket Entry 54 at 38; Docket Entry 48 at 16-17).) Moreover, the Cooks maintain that Mr. Cook "did not make any suicidal statements and he did not take any actions which could reasonably be construed by the officers as a suicide attempt." (Id. (citing Docket Entry 42 at 103-05, 110-13, 163-64; Docket Entry 49 at 60; Docket Entry 45 at 34-35, 47, 49; Docket Entry 54 at 64, 84-85).)

Deputy Thomas and Sergeant Wensil recount very different events. First, after declining to come down, Mr. Cook said "'the only way I'm coming down is – I'm coming down my way, and I'm coming down head first,'" which Deputy Thomas and Sergeant Wensil considered a suicide threat. (Docket Entry 35 at 3 (quoting Docket

-3-

Entry 56 at 68).) In addition, Mr. Cook "looked at his left wrist and said 'I guess I didn't cut myself deep enough.' He said he would get the cut right the second time." (Id. (quoting Docket Entry 55 at 22).) Moreover, Deputy Thomas "saw a cut across [Mr. Cook's] left wrist." (Id. (citing Docket Entry 56 at 69).) Mr. Cook also pulled a knife from his pocket. (Id. (citing Docket Entry 56 at 29); see also Docket Entry 55 at 21 ("It appeared to be like a Swiss Army type knife. It was red; that's the best way I can describe it.").) He opened the knife "and, despite Deputy Thomas's command to drop the knife, [Mr. Cook] refused and Deputy Thomas deployed the TASER." (Docket Entry 35 at 3 (citing Docket Entry 56 at 70).) Both Deputy Thomas and Sergeant Wensil warned Mr. Cook "several times" before Deputy Thomas deployed the TASER. (Id. (citing Docket Entry 56 at 43-44; Docket Entry 55 at 19).)

Before using the TASER, Deputy Thomas considered several alternatives, including "doing nothing, climbing a ladder with an impact weapon, or using OC spray." (Id. (citing Docket Entry 56 at 29).) Deputy Thomas decided that the OC spray would not work (because it would "fall back on [him]") and that Mr. Cook's elevated position would prevent "safe and effective use of any impact weapon" and would expose Deputy Thomas and/or Sergeant Wensil to "the risk of a stab wound . . . from Mr. Cook's knife." (Id. at 3-4 (citing Docket Entry 56 at 29).) Rather than do nothing, Deputy Thomas chose to use the TASER "to prevent Mr. Cook

-4-

from harming himself," thinking "it would cause Mr. Cook to lock up and drop the knife." (Id. at 4 (citing Docket Entry 56 at 30; Docket Entry 55 at 57).) Deputy Thomas perceived a reduced risk of a fall because Mr. Cook "was seated and had a rail around him, and the effects [of the TASER] could be turned off instantly." (Id. (citing Docket Entry 56 at 35; Docket Entry 55 at 51-52).)[2]

It appeared to both Deputy Thomas and Sergeant Wensil that the TASER "only affected Mr. Cook for a second before he broke the circuit." (Id. (citing Docket Entry 56 at 40; Docket Entry 55 at 70).) After the cycle finished, Mr. Cook said, "'I told you the

---

[2] In his deposition, Deputy Thomas described his thought process as follows:

Q. Prior to the use of the TASER, did you consider the risk of fall?
A. There was a risk, yes.
. . .
Q. Did you consider the risk of injury from the fall?
A. Yes.
Q. And what did you think that was?
A. I felt that it was lessened at that point because Number 1, Mr. Cook was in a seated position. He had — he was in a tree stand that had a rail, a safety rail around it. And then if I did deploy the TASER, if I thought he was going to possibly slide off or anything, I can actually turn off the TASER and he — the effects are over with, he can actually then grab or try to steady himself.
. . .
Q. What did you think the risk of fall was in that situation? If you can use percentages, do you think there was a 50 percent chance he would fall, 20 percent, 80 percent?
. . .
A. Probably about 40 percent.

(Docket Entry 56 at 35-36.)

only way I'm coming down is on my own, head first.'" (<u>Id.</u> (quoting Docket Entry 56 at 41).) Mr. Cook then lifted the stand's safety bar and jumped out of the stand. (<u>Id.</u> (citing Docket Entry 56 at 41; Docket Entry 55 at 70).) In addition, Mr. Cook reportedly told one of the emergency responders, Jeffrey Michael Penninger, that he had cut his wrist (<u>id.</u> at 5 (citing Docket Entry 48 at 37 ("I did ask him how he got the laceration on his wrist and he said he was trying to cut his wrist")))), and had jumped from the stand (<u>id.</u> (citing Docket Entry 48 at 38 ("The best I can remember is that he told me he jumped out of the tree stand.")))). In his deposition, Mr. Penninger noted that Mr. Cook "had like a little minor cut on one of his wrists and . . . it was very minor . . . [without] really significant bleeding . . . ." (Docket Entry 48 at 19.)

Based on the foregoing events, the Cooks pursue claims for: (1) excessive force under 42 U.S.C. § 1983 against Deputy Thomas and Sergeant Wensil in their individual capacities; (2) assault and battery under North Carolina law against Deputy Thomas (in his individual and official capacities) and Defendant Cabarrus County Sheriff Brad Riley (in his official capacity); (3) for gross negligence under North Carolina law against Deputy Thomas and Sergeant Wensil (in their individual and official capacities) and Sheriff Riley (in his official capacity); (4) for negligence under North Carolina law against Deputy Thomas, Sergeant Wensil, and Sheriff Riley in their official capacities; (5) for loss of

-6-

consortium under North Carolina law against Deputy Thomas, Sergeant Wensil, and Sheriff Riley; and (6) for liability on official bond under North Carolina law against Defendant Pennsylvania National Mutual Casualty Insurance Company. (See Docket Entry 1, ¶¶ 75-99, 103-08, 117-37; Docket Entry 39 at 1-2.)[3] Deputy Thomas, Sergeant Wensil, and Sheriff Riley (collectively, "Defendants") have moved for summary judgment on all such claims. (Docket Entry 34 at 1-2.)

## II. Summary Judgment Standard

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a genuine dispute exists if the evidence presented

---

[3] The Complaint originally named as Defendants Deputy Thomas, Sheriff Riley, John Doe, Richard Roe, and XYZ Corporation (Docket Entry 1, ¶¶ 7-10) and brought the following eight claims: (1) "Violation of Federal Constitutional Rights" (id. ¶¶ 75-99); (2) "Violation of State Constitutional Rights" (id. ¶¶ 100-02); (3) "Assault and Battery" (id. ¶¶ 103-08); (4) "Intentional and Negligent Infliction of Emotional Distress" (id. ¶¶ 109-16); (5) "Gross Negligence" (id. ¶¶ 117-23); (6) "Negligence" (id. ¶¶ 124-30); (7) "Loss of Consortium" (id. ¶¶ 131-33); and (8) "Liability on Official Bond" (id. ¶¶ 134-37). An amendment "delet[ed] John Doe as a party Defendant and in lieu thereof insert[ed] [Sergeant] Wensil as a party Defendant individually and in his official capacity . . . ." (Docket Entry 5 at 1.) The amendment also eliminated Richard Roe as a Defendant and substituted Pennsylvania National Mutual Casualty Insurance Company for XYZ Corporation. (Id. at 1-2.) The Cooks subsequently voluntarily dismissed the state constitutional claims and the emotional distress claims via written stipulation of the Parties. (Docket Entry 39 at 1-2.) By the same stipulation, the Cooks dismissed the federal claim against Sheriff Riley, the assault and battery claims against Sergeant Wensil and against Sheriff Riley in his individual capacity, as well as the negligence claims against Deputy Thomas and Sergeant Wensil in their individual capacities. (Id.)

-7-

could lead a reasonable factfinder to return a verdict in favor of the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  In making this determination, the Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The party moving for summary judgment may discharge its burden by identifying an absence of evidence to support the non-moving party's case.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  The non-moving party then must "set forth specific facts showing that there is a *genuine issue for trial*." <u>Matsushita Elec. Indus.</u>, 475 U.S. at 586-87 (citation omitted) (emphasis in original).  In this regard, the non-moving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the non-moving party. <u>Anderson</u>, 477 U.S. at 252 (citation omitted); <u>see also</u> <u>Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

### III.  Proximate Cause of Mr. Cook's Injuries

As an initial matter, Deputy Thomas and Sergeant Wensil argue they are "not subject [] to liability for use of excessive force due to the fact that Mr. Cook . . . jumped from the stand after the

-8-

effects of the TASER had ended, and thus caused his own injuries."
(Docket Entry 35 at 10.)  Deputy Thomas and Sergeant Wensil assert
that, after the TASER deployment, Mr. Cook said "'I told you the
only way I'm coming down is on my own, head first.'"  (Id. at 4
(quoting Docket Entry 56 at 41).)  He then lifted the safety bar
and jumped.  (Id. (citing Docket Entry 56 at 40, 41; Docket Entry
55 at 70).)  Mr. Cook testified that, other than Deana Harrington
telling him to "[h]old on" and the sound of helicopter blades, he
does not remember anything from the time he felt the TASER strike
until he woke up in the hospital.  (Docket Entry 42 at 98-99.)

Four neighbors who witnessed the incident, however, stated in
their depositions that Mr. Cook fell rather than jumped from the
stand.  (Docket Entry 44 at 13, 14, 32, 42; Docket Entry 45 at 44;
Docket Entry 49 at 56; Docket Entry 53 at 31.)  Darryl Brooks, when
asked if "it look[ed] like [Mr. Cook] jumped in any way," responded
"[n]o."  (Docket Entry 49 at 56.)  He was "maybe 50, 60 feet from"
Mr. Cook at the time.  (Id. at 17.)  Karen Brooks, who was
"[p]robably 9 feet or maybe 10 [feet from the stand]" (Docket Entry
44 at 12), repeatedly testified that Deputy Thomas "shot [Mr. Cook]
and he fell" (id. at 13, 14, 32).  Nor did she "recall [Mr. Cook]
maneuvering under a bar before he fell."  (Id. at 42.)  Another
neighbor, Steven Thompson, when asked if "it appear[ed] . . . [Mr.
Cook] fell or he jumped," replied that "[h]e fell."  (Docket Entry
45 at 44.)  Mr. Thompson was "probably about 15 feet" from Deputy

-9-

Thomas.  (Id. at 10.)  Deborah Bare, who thought she was "40 yards, maybe," from the tree stand (Docket Entry 53 at 47), said "[i]t appeared to [her] that [Mr. Cook] fell" when asked "[d]id it appear . . . [Mr. Cook] fell or that [he] jumped?" (id. at 31).

Citing Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), Deputy Thomas and Sergeant Wensil argue "the Court should ignore the conflicting witness statements and consider only the facts from [them] and Mr. Cook."  (Docket Entry 35 at 8.)  In Sigman, "officers had uncontroverted evidence of a suspect's dangerousness and knew that the suspect was armed and was behaving violently within a residence."  Rogers v. Pendleton, 249 F.3d 279, 292 (4th Cir. 2001) (describing Sigman).  The only factual dispute concerned whether the suspect continued to brandish a knife at the officers before they fatally shot him or whether, as two witnesses claimed, he dropped the knife and raised his hands in surrender. Sigman, 161 F.3d at 785-86.  The court in Sigman determined that the discrepancies in witness testimony "need not signify a difference of triable fact.  What matters is whether the officers acted reasonably upon [the reports] *available to them* and whether *they* undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances *they faced*."  Id. at 787 (emphasis in original).

In the circumstances of the case before it, the Fourth Circuit found that the affidavits of the two witnesses could not

-10-

> effectively impact the credibility of [the officer's] testimony (or that of all five other officers on the scene) as to his perception of what he saw from an entirely different - and closer - vantage point, especially when [the officer] had special knowledge of [the suspect's] dangerousness and of the threats that [the suspect] had made on his [own] life.

Id. at 788. The court "reject[ed] the argument that a factual dispute about whether [the suspect] still had his knife at the moment of shooting is material to the question of whether [the firing officer] is entitled to the protections of qualified immunity in the particular circumstances of this case." Id. "Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently - and potentially still is - armed, and who is coming towards the officer despite officers' commands to halt," the court concluded that "the officer's decision to fire [was] not unreasonable." Id.

The reasoning in Sigman does not answer the question of whether, to resolve summary judgment issues in this case, the Court must consider only evidence from Deputy Thomas, Sergeant Wensil, and Mr. Cook in determining whether a material question of fact exists regarding whether Mr. Cook fell or jumped from the tree stand. The court in Sigman addressed the relevance, for summary judgment purposes, of evidence as to events that preceded an officer's use of force. See id. The question of whether Mr. Cook jumped or fell from the tree stand involves a matter of historical

-11-

fact subsequent to the decision to use force. This distinction renders Sigman inapposite on this particular issue.

Deputy Thomas and Sergeant Wensil have averred that Mr. Cook jumped in an attempt to commit suicide. (Docket Entry 35 at 4 (citing Docket Entry 56 at 40-41; Docket Entry 55 at 70, 97).) Four witnesses testified that Mr. Cook fell after deployment of the TASER.[4] Furthermore, as the Cooks have argued, the record would permit a finding that Mr. Cook "did not make any suicidal statements and he did not take any actions which could reasonably be construed by the officers as a suicide attempt." (Docket Entry 46 at 7 (citing Docket Entry 42 at 103-05, 110-13, 163-64; Docket Entry 49 at 60; Docket Entry 45 at 34-35, 47, 49; Docket Entry 54 at 64, 84-85).) Accordingly, when viewed in the light most favorable to the Cooks, a material factual dispute exists as to whether Mr. Cook voluntarily jumped from the stand, which the Court cannot resolve in the context of a summary judgment motion. See

---

[4] Karen Brooks repeatedly testified that Deputy Thomas "shot [Mr. Cook] and he fell." (Docket Entry 44 at 13, 14, 32.) Another exchange in her deposition appears as follows: "Q. The deputies talk about a safety bar or railing and that [Mr. Cook] actually had to bend under that bar, and that they claim he jumped. Do you recall him maneuvering under a bar before he fell? A. No, sir." (Id. at 42.) Steven Thompson gave this account: "Q. And [the officers'] statement also said [Mr. Cook] did this voluntarily, he jumped. Did it appear to you that he fell or he jumped? A. He fell." (Docket Entry 45 at 44.) The transcript of the deposition of Darryl Brooks reflects: "Q. Did it look like [Mr. Cook] jumped in any way? A. No." (Docket Entry 49 at 56.) Deborah Bare testified as follows: "Q. Did it appear to you that [Mr. Cook] fell or that [he] jumped? A. It appeared to me that he fell." (Docket Entry 53 at 31.)

-12-

<u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000) (observing that, at summary judgment stage, "the court . . . may not make credibility determinations or weigh the evidence").

<u>IV. Excessive Force</u>

The Cooks contend that the actions of Deputy Thomas and Sergeant Wensil "violated [Mr.] Cook's civil and constitutional rights protected by the Fourth Amendment of the United States Constitution, specifically [his] right to . . . freedom from the application of excessive and unreasonable force." (Docket Entry 1, ¶ 76.)[5] Deputy Thomas and Sergeant Wensil argue that this claim cannot proceed because they "acted reasonably based on the information available to them to prevent [Mr. Cook] from further harming himself." (Docket Entry 68 at 1.) They also assert that the defense of qualified immunity bars any recovery "because Deputy Thomas and Sergeant Wensil acted reasonably based on the information available to them and in light of the circumstances they encountered." (<u>Id.</u> at 2.)

---

[5] The Complaint alleges violations of Mr. Cook's Fourth Amendment right "to freedom from unlawful search and seizure of his person, to freedom from unlawful assault and battery, and to freedom from the application of excessive and unreasonable force." (Docket Entry 1, ¶ 76.) However, the subsequent filings by the Cooks make clear that the Fourth Amendment claim is one of excessive force. (<u>See</u> Docket Entry 46 at 2 ("[Mr.] Cook filed this civil rights action alleging excessive force claims under the Fourth Amendment and North Carolina state law. . . . [T]he remaining claims . . . [include] [e]xcessive force under the 4th Amendment . . . ."), 18 (noting that assault and battery claim(s) arise under state not federal law).)

An analysis of the viability of Mr. Cook's cause of action under Section 1983 against Deputy Thomas and Sergeant Wensil merges with the two-pronged determination of whether they enjoy qualified immunity: "The government official will be granted immunity unless (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) the right at issue was clearly established at the time of the alleged misconduct." <u>Doe ex rel. Johnson v. South Carolina Dep't of Soc. Servs.</u>, 597 F.3d 163, 170 (4th Cir. 2010). The Court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

## A. Violation of a Constitutional Right

All constitutional claims of excessive force that arise in the context of "an arrest, investigatory stop, <u>or other</u> 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." <u>Graham v. Connor</u>, 490 U.S. 386, 395-96 (1989) (emphasis added).[6]  To succeed on such a claim, a

---

[6] Deputy Thomas and Sergeant Wensil appear to claim that the Fourth Amendment standard does not apply in this case because the arrest warrant was "not the reason that Mr. Cook was TASERed." (Docket Entry 35 at 13.)  Rather, they argue "[h]e was TASERed because he refused to drop the knife in his hand that he was going to use to harm himself."  (<u>Id.</u>)  The above-quoted language in <u>Graham</u> makes clear that the Fourth Amendment "reasonableness" standard applies not just in the arrest context, but rather to all "seizures."  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority,

plaintiff must show that the defendant "inflicted unnecessary and wanton pain and suffering." Whitley v. Albers, 475 U.S. 312, 320 (1986). This determination involves utilization of an objective standard, Graham, 490 U.S. at 395-96, to make a "careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests,' against the countervailing governmental interests at stake," id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)).

"[P]roper application [of this standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the [event that authorized the seizure], whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting [seizure] or attempting to evade [seizure] by flight." Id. "The

---

terminates or restrains his freedom of movement . . . through means intentionally applied." Brendlin v. California, 551 U.S. 249, 254 (2007) (internal quotations, citations, and emphasis omitted). Deployment of a TASER constitutes an intentional use of physical force and/or show of authority that restrains the freedom of movement of the person subjected to the TASER. See Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010) ("Although Tasers may not constitute deadly force, their use unquestionably 'seizes' the victim in an abrupt and violent manner."); United States v. Lindsey, No. 11-CR-92, 2012 WL 1249521, at *5 (E.D. Tenn. Apr. 13, 2012) (unpublished) ("Defendant was not seized until [the officer] used his taser to subdue Defendant."); Keller v. Town of Colonial Beach, Civil Action No. 3:07CV433-HEH, 2007 WL 2985004, at *4 (E.D. Va. Oct. 10, 2007) (unpublished) (ruling that individual hit with TASER "was plainly seized within the meaning of the Fourth Amendment"). The deployment of the TASER against Mr. Cook thus qualifies as a seizure and, therefore, under Graham, the Fourth Amendment reasonableness standard applies in this case.

extent of the plaintiff's injury is also a relevant consideration."
Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).  Although at
summary judgment the Court must view the evidence in a light most
favorable to the non-moving party, Matsushita Elec. Indus., 475
U.S. at 587, in an excessive force case, "the reasonableness of
[the officer's] response must be gauged against the reasonableness
of [the officer's] perceptions, not against what may later be found
to have actually taken place."  Gooden v. Howard Cnty., Md., 954
F.2d 960, 965 (4th Cir. 1992).

     In the instant case, Deputy Thomas and Sergeant Wensil assert
that they "had to act and did so to prevent Mr. Cook from
continuing to injure himself."  (Docket Entry 35 at 10.)  They
further argue that the TASER deployment represented "a reasonable
decision that does not subject them to liability for use of
excessive force . . . ."  (Id.)  Notably, Deputy Thomas and
Sergeant Wensil do not contend that they acted reasonably in light
of the circumstances described in the version of events presented
by the Cooks.  (See Docket Entry 35 at 9-10.)  Rather, Deputy
Thomas and Sergeant Wensil rely on their own factual account in
concluding that they "did not breach any rights of [Mr. Cook] by
preventing him from harming himself further."  (Id. at 9.)  In
contrast, the Cooks argue that "there are genuine issues of
material fact as to the facts and circumstances of Deputy Thomas'
use of force," such that summary judgment "must be denied."

(Docket Entry 46 at 16.) Whether Mr. Cook posed a threat to anyone (including himself) represents a central issue in the instant case, and a matter as to which material factual disputes exist.

### 1. Government Interest in Seizing Mr. Cook

Deputy Thomas and Sergeant Wensil assert that Deputy Thomas "discharged his TASER to . . . prevent [Mr. Cook] from harming himself further." (Docket Entry 35 at 1.) In assessing the government interest in that seizure, these facts stand undisputed:

1) Mrs. Cook took out a warrant on Mr. Cook after he "'pushed her down'" (id. at 2 (quoting Docket Entry 42 at 80));

2) Deputy Thomas and Sergeant Wensil "were aware that both Mr. and Mrs. Cook had concealed carry weapon permits" (id. at 3 (citing Docket Entry 55 at 35); see also Docket Entry 56 at 15), but never observed a firearm in the stand with Mr. Cook (Docket Entry 35 at 3-4; see also Docket Entry 55 at 130-31; Docket Entry 56 at 69);[7]

3) Mr. Cook exhibited "slurred speech and appeared to be a little impaired" (Docket Entry 46 at 5 (citing Docket Entry 56 at 45; Docket Entry 55 at 97-98)), and admitted taking prescription pain and anxiety pills (id. (citing Docket Entry 42 at 89-90); see also Docket Entry 35 at 3 (citing Docket Entry 56 at 44-45)); and

---

[7] The record reflects a dispute between Mrs. Cook and Deputy Thomas as to whether she told him Mr. Cook had taken a firearm with him when he went out into the woods behind the house. (Compare Docket Entry 43 at 45, with Docket Entry 56 at 19, 20-21.)

4) while in the stand, "Mr. Cook did not threaten either officer and did not pose an immediate threat to their safety" (Docket Entry 46 at 7 (citing Docket Entry 60, ¶ 29; Docket Entry 61, ¶ 41)).

The Parties, however, contest whether Mr. Cook posed a threat to himself. (Docket Entry 35 at 3-4; Docket Entry 46 at 7.) Sergeant Wensil testified that Mr. Cook said "'I guess I didn't cut myself deep enough'" (Docket Entry 35 at 3 (quoting Docket Entry 55 at 22)) and that he "would get the cut right the second time" (id. (citing Docket Entry 55 at 22)). Deputy Thomas averred that Mr. Cook then "opened a knife" and refused to drop it, "despite Deputy Thomas's command" to do so. (Id. (citing Docket Entry 56 at 70).) The Cooks, on the other hand, contend that the record supports a finding that Mr. Cook "did not have a knife or any other objects in either one of his hands when he was tasered." (Docket Entry 46 at 7 (citing Docket Entry 42 at 131; Docket Entry 49 at 32-33; Docket Entry 44 at 31, 53; Docket Entry 53 at 24, 44; Docket Entry 45 at 34-35, 40, 47, 49-50; Docket Entry 54 at 31, 62).) In addition, Mr. Cook testified he had "one arm on the back rail [of the stand] and one hand on the safety bar." (Docket Entry 42 at 125.)

Further, witness Darryl Brooks averred that Mr. Cook "had his hands up across the railing of the stand itself . . . [a]nd then . . . he drop[ped] his hands and [was] just talking to the officers with his hands in . . . a normal position, maybe around his lap."

(Docket Entry 49 at 19.)  Mr. Brooks also reported that he "didn't
see a knife."  (Id. at 32.)  Witness Debra Bare testified that
"[Mr. Cook] wasn't doing anything [with his hands].  He was still.
He was being still."  (Docket Entry 53 at 17.)  She also did not
"see a knife or any weapon in [Mr. Cook's] hands while he was in
the deer stand."  (Id. at 24.)

Moreover, the Cooks have cited record evidence from which a
reasonable factfinder could conclude that Mr. Cook "did not make
any suicidal statements and he did not take any actions which could
reasonably be construed by the officers as a suicide attempt."
(Docket Entry 46 at 7 (citing, inter alia, Docket Entry 42 at 104
(setting out denial by Mr. Cook that, in the ambulance, he said
that he "did not like [his] life and wanted to end it"), 110
(stating that he did not "use either [his] Swiss Army knife, or the
knife from [his] father to cut [his] wrist the day of [the]
incident"), 113 (testifying that he "didn't cut [his] wrists with
a knife"); Docket Entry 49 at 60 (documenting testimony by Darryl
Brooks that he did not "ever see [Mr. Cook] with a knife, either
hand, cutting . . . his wrist or cutting any part of his body");
Docket Entry 45 at 34-35 (reflecting testimony by Steven Thompson
that he "would [have been] able to see" if Mr. Cook "had a knife in
his hand" and that Mr. Cook did not hold up a knife), 47 ("That
right there is – this statement that they have in here [that Mr.
Cook pulled a knife from his pocket] is not true . . . ."), 49

-19-

(denying observation of Mr. Cook "'pull[ing] out a Swiss Army knife which was red in color'"); Docket Entry 54 at 64 (relating testimony from Risa Thompson that, from "about 15 feet away, I believe I could've seen him making motions, you know, doing that [cutting his wrist], but I never - the only thing I saw was him just leaning down.  I never saw him in a position to where [sic] I thought he would do that."), 84 ("I never saw a knife.")).)

A series of Fourth Circuit cases on excessive force generally indicate that a material factual question exists as to whether this case involved circumstances that gave rise to a governmental interest sufficient to justify a significant use of force.  First, in Sigman, discussed previously, the Fourth Circuit upheld a grant of summary judgment for the defendants in an excessive force case in which law enforcement officers fatally shot a suspect.  Sigman, 161 F.3d at 788.  The plaintiffs in that case relied on two witnesses in a crowd across the street from the incident, who said the suspect had dropped his knife and raised his hands in surrender before the shooting.  Id. at 786.  The court nevertheless found that the witness affidavits could not

> effectively impact the credibility of [the officer's]
> testimony (or that of [the other] five officers on the
> scene) as to his perceptions of what he saw from an
> entirely different - and closer - vantage point,
> especially when [the officer] had special knowledge of
> [the suspect's] dangerousness and of the threats that
> [the suspect] had made on his life.

Id. at 788. The court ultimately "reject[ed] the argument that a factual dispute about whether [the suspect] still had his knife at the moment of shooting is material . . . in the particular circumstances of th[at] case." Id.

The Fourth Circuit revisited Sigman in Rogers, 249 F.3d at 292, and noted that "*Sigman* does not stand for the proposition that the objective facts of an encounter are always legally irrelevant whenever an officer asserts that his perception of an encounter was such as to justify his action." Id. The Fourth Circuit contrasted Sigman with the case before it, in which a suspect arrested for public intoxication challenged the lawfulness of his arrest because he had only consumed one beer within a two-and-a-half hour time frame, such that the officers could not reasonably have perceived him as drunk. Id. at 293. The court determined that applying Sigman to that case "would work an unwarranted extension of a decision intended to protect officers making split-second self-defense decisions into the realm of minor public morals arrests which are manifestly unjust if disputed factual issues are resolved in the nonmovant's favor." Id.

Thereafter, the Fourth Circuit decided Schultz v. Braga, 455 F.3d 470 (4th Cir. 2006), a case which arose after federal agents performed a "dynamic vehicle stop" because they reasonably believed the vehicle carried the main suspect in a bank robbery and, during the stop, shot a passenger in the face. Id. at 473-74. In

-21-

affirming the denial of summary judgment for the agent who shot the passenger, the Fourth Circuit noted that

> genuine issues of material fact remain[ed] as to whether [the passenger] was making a noncompliant, dangerous movement in the split second before [the agent] fired his gun and whether [the agent], when he responded with deadly force to [the passenger's] movements, had probable cause to believe the [passenger] posed a threat of serious physical harm to the agents . . . .

Id. at 478 (internal quotations and citations omitted).

More specifically, the passenger claimed he "was moving his whole upper body, hands raised, *right* towards the door handle to unlock the door as commanded," whereas the agent "contend[ed] that the [passenger] failed to comply with repeated commands to raise his hands and moved his body to the *left*, towards the inner console of the car, with his hands down as if to retrieve a gun . . . ." Id. (emphasis in original).  Under those circumstances, the Fourth Circuit could not find,

> viewing the evidence in the light most favorable to [the passenger], . . . that a reasonable police officer in [the agent's] position could have believed that the [passenger] was making a noncompliant movement that pose[d] a threat of serious physical harm, either to the [agent] or others, warranting the use of deadly force.

Id. (internal quotations and citations omitted).[8]

Furthermore, a court within this Circuit also has denied summary judgment in a case somewhat analogous to the one at hand. In Dent v. Montgomery Cnty. Police Dep't, 745 F. Supp. 2d 648 (D.

---

[8] Notably, in so finding, the Fourth Circuit did not reference Sigman, thus showing the limited reach of said decision.

Md. 2010), the court denied the defendants' motion for summary judgment in an excessive force case involving the deployment of a TASER against a suspected suicidal individual. The officers, who responded to a 911 call from a friend of the plaintiff, claimed the plaintiff "acted with increasing levels of agitation and violence," kicked an officer, and bit another. Id. at 658. They reportedly "warned [the plaintiff] that they would have to use their Tasers if she would not submit to being handcuffed and taken to the hospital." Id. Conversely, the plaintiff insisted she "was not aggressive toward the officers." Id. In denying summary judgment for the officers, the court concluded "there [we]re genuine issues of material fact as to whether their actions were reasonable." Id.

To sum up, the Fourth Circuit made it clear in Sigman that not all disputed facts surrounding an officer's use of force qualify as material for purposes of assessing the government interest in making a seizure (and thus the reasonableness of the officer's decision to use a particular level of force). Sigman, 161 F.3d at 788 (noting that "[w]here an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has recently – and potentially still is – armed [with a knife], and who is coming towards the officer despite officers' commands to halt," the question of whether or not the suspect "still had his knife at the moment of shooting" is not material"). Subsequent cases, however,

-23-

signify that the holding in Sigman does not apply broadly beyond the facts of that case. See, e.g., Rogers, 249 F.3d at 292-93 (distinguishing Sigman because officers there "had uncontroverted evidence of a suspect's dangerousness," knew without dispute that suspect was "armed and was behaving violently," and needed to make "split-second self-defense decision").

In the instant case, a genuine factual dispute exists as to whether Mr. Cook posed a threat to himself, a matter material to an assessment of the governmental interest in seizing him (and thus the disposition of the instant Motion). On the one hand, Deputy Thomas reported observing Mr. Cook raising a pocket knife to his arm. (Docket Entry 35 at 3 (citing Docket Entry 56 at 69-70).) Indeed, both Deputy Thomas and Sergeant Wensil specifically averred they saw a red-handled knife in Mr. Cook's hand. (Docket Entry 55 at 21; Docket Entry 56 at 72.) Mr. Cook, however, testified that he had "one arm on the back rail [of the tree stand] and one hand on the safety bar" (Docket Entry 42 at 125) and that he did not "possess a large red Swiss Army knife" while in the stand (id. at 131). Other witnesses also gave testimony that conflicts with the testimony on point by Deputy Thomas and Sergeant Wensil. (See Docket Entry 45 at 34-35, 47, 49; Docket Entry 49 at 60; Docket Entry 54 at 64, 84-85).) Taking the evidence in the light most favorable to the Cooks, a factfinder thus could determine that Mr. Cook did not move his hands in such a way as to allow Deputy Thomas

-24-

and Sergeant Wensil to form a reasonable belief that Mr. Cook had a knife he intended to use on himself.[9]

Under these circumstances, the Court cannot find as a matter of law that the government interest in using force against Mr. Cook was other than very low, because Mr. Cook posed no threat to the officers or the public, did not actively resist seizure, and (viewing the evidence in the light most favorable to him) neither made statements nor exhibited conduct that indicated suicidal intent. At most, the record (again, if construed in Mr. Cook's favor) requires the Court to credit, as a basis for any concern by Deputy Thomas and Sergeant Wensil for Mr. Cook's safety, only the fact that he recently had a domestic row, took some prescription medicine, and declined to come down from a tree stand. Knowledge of these facts simply does not establish as a matter of law that a reasonable officer would perceive a grave threat of suicide.

## 2. Level of Force Used against Mr. Cook

Having deduced what the record reflects (for summary judgment purposes) as to the governmental interest in using force, the next

---

[9] Moreover, Mr. Cook neither actively resisted nor attempted to flee. (Docket Entry 35 at 3-4; Docket Entry 46 at 6.) His refusal to come down from the stand does not constitute the type of resistance that would justify great force. See, e.g., Bryan v. MacPherson, 630 F.3d 805, 829-30 (9th Cir. 2010) (distinguishing between active and passive resistance and finding noncompliance with command to remain in vehicle "does not constitute 'active resistance' supporting a substantial use of force"); Estate of Escobedo v. Bender, 600 F.3d 770, 780-81 (7th Cir. 2010) (observing that armed individual who threatened suicide and would not leave apartment "was not resisting arrest [or] fleeing from the police").

-25-

step in "[d]etermining the reasonableness of the challenged actions" requires assessment of the "'nature and quality of the intrusion on [Mr. Cook's] Fourth Amendment interests.'" Schultz, 455 F.3d at 477 (quoting Graham, 490 U.S. at 396). In this regard, the Fourth Circuit has noted that a TASER "'inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless.'" Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008) (quoting Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993)). It has further recognized that the injury inflicted by a TASER "consist[s] of far more than the resulting sunburn-like scar," id., and that the injury from a TASER does not qualify as "de minimis," id. at 447-48.

Other circuits similarly have found a TASER deployment to constitute a significant intrusion upon an individual. See Bryan, 630 F.3d at 826 (describing TASER usage as "intermediate, significant level of force"); Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010) (noting that TASER is "a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain. . . . Accordingly, the nature and quality of the intrusion . . . [is] quite severe." (internal citations omitted)); Oliver v. Fiorino, 586 F.3d 898, 903 (11th Cir. 2009) (observing that TASER is "designed to cause significant, uncontrollable muscle contractions capable of incapacitating even the most focused and aggressive

-26-

combatants" (internal quotation marks omitted)); Hickey, 12 F.3d at 757 ("We find defendants' attempt, on appeal, to minimize the pain of being shot with a stun gun . . . to be completely baseless. The defendants' own testimony reveals that a stun gun inflicts a painful and frightening blow . . . .").

Furthermore, in assessing the intrusion caused by a use of force, courts have considered indirect injuries that result. See, e.g., Bryan, 630 F.3d at 824 (taking into account injuries resulting from face-first fall onto pavement after TASER strike, i.e., broken teeth, abrasions, and swelling). The Ninth Circuit in Bryan noted that "[a] reasonable police officer with [the defendant's] training on the [TASER] would have foreseen these physical injuries when confronting a shirtless individual standing on asphalt." Id. Thus, in evaluating the nature and quality of the force used in this case, the Court properly may consider the evidence that Mr. Cook suffered extreme derivative injuries from the TASER deployment. (See Docket Entry 46 at 8 (citing Docket Entry 42 at 135; Docket Entry 43 at 57; Docket Entry 63 at 1-2).)

### 3. Comparing Government Interest and Level of Force

Viewing the evidence in the light most favorable to the Cooks, a reasonable factfinder could conclude that Deputy Thomas's use of a TASER, particularly on an individual positioned, like Mr. Cook, on a small elevated platform, was unreasonable and therefore excessive in light of the minimal interest underlying the seizure.

Indeed, even if the record established, as a matter of law, that Deputy Thomas and Sergeant Wensil reasonably perceived Mr. Cook as having threatened self-injury with a knife, a factfinder could conclude that the instant TASER deployment represented an unreasonable use of force. As the Ninth Circuit recently noted, "it would be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself." <u>Glenn v. Washington Cnty.</u>, 673 F.3d 864, 872 (9th Cir. 2011).

In <u>Glenn</u>, the court reversed a grant of summary judgment to defendant officers who shot a suspect with a beanbag gun when the suspect held a knife to his own throat and threatened to kill himself, but posed no threat to others. <u>Id.</u> at 878. The court found "no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from attempting suicide." <u>Id.</u> at 872 (emphasis in original).[10] Similarly, in <u>Escobedo</u>, 600 F.3d at 780-81, the Seventh Circuit upheld a denial of summary judgment where officers used tear gas and flash bang devices to enter the apartment of a suicidal individual who posed

---

[10] The Ninth Circuit did not address whether use of a TASER, rather than a beanbag gun, would have constituted a reasonable amount of force, but did observe that the department in question generally "consider[ed] electrical stun devices to be lesser force than [bean-bag] munitions." <u>Glenn</u>, 673 F.3d at 877; <u>see also id.</u> at 878 n.10. Moreover, given the facts of that case, the Ninth Circuit had no occasion to consider how the precarious location of the suspect might alter the assessment of the level of intrusion associated with a particular TASER deployment. <u>See id.</u>

a threat only to himself.  In so doing, the Seventh Circuit ruled that the district court "could reasonably question whether the Defendant Officers had legitimate reasons to conclude that their use of tear gas and flash bang devices in this situation was acceptable," id. at 780, particularly given that the suspect neither posed a threat to anyone else nor attempted to flee or to actively resist and that the officers did not know the location of the suspect in the room, id. at 780-81.

In this case, a reasonable factfinder likewise could determine that, even if Mr. Cook posed a threat to himself, the officers' conduct qualified as unreasonable, and therefore excessive, under the circumstances.  In other words, accepting that law enforcement officers generally may use force to prevent an individual from engaging in self-harm, the level of such force may not exceed that reasonably warranted by any particular situation.  As discussed previously, a TASER deployment constitutes a significant intrusion upon an individual.  Furthermore, Mr. Cook was perched on a small platform 15 feet in the air at the time of the TASER deployment. (Docket Entry 46 at 4; see also Docket Entry 46-1.)  A factfinder could conclude that a reasonable officer would foresee that utilizing a TASER under such circumstances could cause the targeted individual to fall and thereby to suffer serious harm, indeed, more serious harm than cuts to a wrist with a Swiss Army knife.

Simply put, upon balancing the interests of the government in using force with the level of force used (all the while taking the record evidence in a light most favorable to the Cooks), the Court should conclude that material questions of fact remain regarding whether the instant TASER deployment constituted excessive force.

B. Established Constitutional Right at the Time of Injury

Because of the assertion of the qualified immunity defense, the Court also must consider whether the constitutional violation as to which the Cooks have raised a material factual dispute involved a right then clearly established. See Pearson, 555 U.S. at 231. Qualified immunity "protects officers who commit Constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 532 (4th Cir. 2011). "The standard is again one of objective reasonableness: the 'salient question' is whether 'the state of the law' at the time of the events at issue gave the officer 'fair warning' that his alleged treatment of the plaintiff was unconstitutional." Jones, 325 F.3d at 531 (quoting Hope v. Pelzer, 536 U.S. 730, 731 (2002)).

For reasons discussed in the preceding subsection, taking the record evidence in the light most favorable to the Cooks, a reasonable factfinder could conclude that deploying a TASER against someone in a tree stand who either posed no threat to anyone (including himself) or, at most, posed only a limited threat to

-30-

himself (in the form of wrist-cutting with a Swiss Army knife) constitutes excessive force. Moreover, in seeking summary judgment, Deputy Thomas and Sergeant Wensil have failed to argue that "the state of the law at the time of the events at issue [did not give them] fair warning that [such conduct] . . . was unconstitutional," <u>Jones</u>, 325 F.3d at 531 (internal quotation marks omitted). (<u>See</u> Docket Entry 35; Docket Entry 68.) Instead, they have focused on the notion that the record establishes as a matter of law that they reasonably perceived Mr. Cook as on the verge of cutting his wrist with a Swiss Army knife and that, as a result, they properly could deploy a TASER against Mr. Cook despite the risk he might fall. Because (for reasons discussed in the prior subsection) the record does not compel those conclusions, the Court should decline to enter summary judgment for Deputy Thomas and Sergeant Wensil on the Section 1983 claim notwithstanding their assertion of a qualified immunity defense.

### V. Assault and Battery

#### A. Deputy Thomas

The Cooks also seek recovery for assault and battery against Deputy Thomas under North Carolina law, which provides that "'a civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances.'" <u>Thomas v. Sellers</u>, 142 N.C. App.

310, 315, 542 S.E.2d 283, 287 (2001) (quoting <u>Myrick v. Cooley</u>, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988)).[11]  North Carolina law, however, also recognizes an immunity doctrine, which declares that "a public officer who exercises his judgment and discretion within the scope of his official authority, without <u>malice</u> or corruption, is protected from liability."  <u>McCarn v. Beach</u>, 128 N.C. App. 435, 437, 496 S.E.2d 402, 404 (1998) (emphasis added).

The Fourth Circuit has observed that,

> [u]nder North Carolina law, "[a] defendant acts with <u>malice</u> when he <u>wantonly</u> does that which <u>a man of reasonable intelligence would know to be contrary to his duty</u> and which he <u>intends to be</u> prejudicial or <u>injurious</u> to another."  An action is <u>wanton</u> if "it is done with wicked purpose, or when done <u>needlessly, manifesting a reckless indifference to the rights of others</u>."

<u>Alford v. Cumberland Cnty.</u>, No. 06-1569, 2007 WL 2985297, at *7 (4th Cir. Oct. 15, 2007) (unpublished) (quoting <u>Grad v. Kaasa</u>, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984)).  In other words, this doctrine precludes liability, unless the evidence would allow a factfinder to conclude the officer took an action:  (1) knowing that injury would result; (2) without justifiable need; (3)

---

[11]    In addressing claims under North Carolina law, this Court "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding, and departing from an intermediate [North Carolina appellate] court's fully reasoned holding as to state law only if convinced that [North Carolina's] highest court would not follow that holding."  <u>Iodice v. United States</u>, 289 F.3d 270, 275 (4th Cir. 2002) (internal brackets and quotation marks omitted).

-32-

contrary to a reasonable officer's perception of his or her duty; and (4) with reckless indifference to another's rights.

Deputy Thomas contends that, "[a]lthough [the Cooks] alleged that [he] acted maliciously, there is absolutely no evidence to support such claims." (Docket Entry 35 at 13.) Rather, Deputy Thomas asserts that "the testimony from [he and Sergeant Wensil] shows they were trying to help [Mr. Cook] by preventing further harm to himself." (Id.) This argument again fails to allow for the possibility that a factfinder could view the evidence in the light most favorable to the Cooks (and thereby determine that no reasonable officer could have perceived Mr. Cook as presenting a serious threat to himself). (See Docket Entry 35 at 13.) Under that construction of the record, the factfinder reasonably could conclude that Deputy Thomas: (1) intentionally deployed a TASER in a manner he knew would injure Mr. Cook (at minimum, by powerfully shocking him and, possibly, by causing him to fall from a height of 15 feet); (2) did so needlessly; (3) in a fashion that a reasonable officer therefore would recognize as contrary to his or her duty; and (4) with reckless indifference to Mr. Cook's rights.

As a result, the Court should conclude that disposition of the state law assault and battery claim(s) requires credibility determinations and evidence weighing that cannot occur at the summary judgment stage. See Reeves, 530 U.S. at 150. In effect, for summary judgment purposes, the analysis of the instant assault

and battery claim(s) under North Carolina law mirrors the prior analysis of the excessive force claim(s) under federal law. <u>See, e.g.</u>, <u>Rowland v. Perry</u>, 41 F.3d 167, 174 (4th Cir. 1994) ("The parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well."). Because a genuine issue of material fact exists as to the assault and battery claim(s) against Deputy Thomas, the Court should not enter summary judgment for him on said claim(s).

## B. Sheriff Riley

The Complaint also includes claim(s) for assault and battery against Sheriff Riley, based on principles of respondeat superior. (<u>See</u> Docket Entry 1, ¶ 107.)[12]  Under North Carolina law,

> [e]very person injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff . . . or other officer, may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds for the due performance of their duties in office in the name of the State, without any assignment thereof . . . .

N.C. Gen. Stat. § 58-76-5. "The statutory mandate that the sheriff furnish a bond works to remove the sheriff from the protective embrace of governmental immunity, . . . where the surety is joined as a party to the action." <u>Messick v. Catawba Cnty., N.C.</u>, 110 N.C. App. 707, 715, 431 S.E.2d 489, 494 (1993).

---

[12] For state tort claims, unlike claims under Section 1983, the doctrine of respondeat superior can apply. <u>See</u> <u>W.E.T. v. Mitchell</u>, No. 1:06CV487, 2007 WL 2712924, at *10, 13 (M.D.N.C. Sept. 14, 2007) (unpublished) (Beaty, C.J.).

-34-

According to the Cooks, Sheriff Riley thus bears respondeat superior liability for Deputy Thomas's actions because Sheriff Riley "furnished a bond or bonds payable to the State of North Carolina conditioned upon the faithful execution of his office." (Docket Entry 1, ¶ 134 (internal parenthetical omitted).) Moreover, the Answer admits that "Pennsylvania National Mutual Casualty Insurance Company is the surety on the official bond of Sheriff Riley . . . ." (Docket Entry 9, ¶ 10.) Accordingly, in light of <u>Messick</u>, the Court should decline to enter summary judgment for Sheriff Riley as to the assault and battery claim(s).

<u>VI. Negligence</u>

<u>A. Deputy Thomas and Sergeant Wensil</u>

The Cooks continue to pursue negligence claims against Deputy Thomas and Sergeant Wensil (in their official capacities). (<u>See</u> Docket Entry 39 at 2.) To make out a negligence claim under North Carolina law, a plaintiff must show: "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." <u>Stein v. Asheville City Bd. of Educ.</u>, 369 N.C. 321, 328, 626 S.E.2d 263, 267 (2006). Deputy Thomas and Sergeant Wensil seek summary judgment on the instant negligence claims only on the ground that the Court should strike the expert designation made by the Cooks. (Docket Entry 35 at 14-15; <u>see also</u> Docket Entry 32.)

Specifically, according to Deputy Thomas and Sergeant Wensil, if the Court strikes those experts, the Cooks "cannot satisfy two

-35-

elements of their claims for negligence and gross negligence"
(Docket Entry 35 at 15), i.e., "a standard or breach of standard"
(id. at 14). The Cooks respond that "there are no North Carolina
cases holding that the expert testimony of a law enforcement
officer is essential to a negligence or a gross negligence claim."
(Docket Entry 46 at 19.) As a result, the Cooks reason that, even
without their experts, the negligence claim(s) survive summary
judgment because "a jury could find from [the] evidence that the
officers failed to act in a reasonably prudent manner when they
tasered [Mr.] Cook . . . ." (Id. at 20.)

Other courts in this Circuit have noted that "analysis
regarding [a plaintiff's] Section 1983 claim governs analysis of
[parallel] claims alleging theories of ordinary negligence."
McCloud v. Hildebrand, No. 5:07CV89-V, 2010 WL 4791075, at *8
(W.D.N.C. Nov. 16, 2010) (unpublished) (citing Sigman, 161 F.3d at
788-89, and Ingle v. Yelton, 345 F. Supp. 2d 578, 584 (W.D.N.C.
2004)). Given this authority and the absence of case law holding
that a claim of negligence in this context requires expert support,
the Court should decline to enter summary judgment on the
negligence claim(s) against Deputy Thomas and Sergeant Wensil.

## B. Sheriff Riley

For reasons stated in the discussion of the assault and
battery claim against Sheriff Riley, as well as in the discussion
of the negligence liability of Deputy Thomas and Sergeant Wensil,

the Court should decline to enter summary judgment for Sheriff Riley on the instant negligence claim.

## VII.  Gross Negligence

To make out their claims for gross negligence (Docket Entry 1, ¶¶ 117-23), in addition to the elements of negligence, the Cooks must show "wanton conduct done with conscious or reckless disregard for the rights and safety of others." Toomer v. Garrett, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002).  The instant Motion does not seek summary judgment based on this additional element.  (See Docket Entry 35 at 14-15.)  Rather, relying on the previously-discussed contention that the Cooks cannot establish two of the elements of negligence, the instant Motion asserts that they cannot make out a claim for gross negligence.  (Id.)  Accordingly, because the Court should deny summary judgment as to negligence, it should permit the gross negligence claim to go forward as well.

## VIII.  Loss of Consortium

Defendants assert that "Mrs. Cook's [loss of consortium] claim is wholly derivative from and dependent on Mr. Cook's claims." (Docket Entry 35 at 17.)  Relying on the assumption that the Court will grant summary judgment in their favor on the claims of assault and battery, negligence, and gross negligence, Defendants argue that "summary judgment as to [Mrs. Cook's] claim for loss of consortium should [therefore] be granted." (Id.)  However, because the Court should deny summary judgment as to the claims of assault

-37-

and battery, negligence, and gross negligence, the Court also should allow Mrs. Cook's loss of consortium claim to proceed.

## IX. Liability on Official Bond

Finally, again prospectively relying on a grant of summary judgment in their favor as to their other state law claims, Defendants assert that "there is no basis for maintaining a suit against the [surety on the official] bond." (_Id._ at 18.)  As with the claim of loss of consortium, because the Court should not grant summary judgment in favor of Defendants as to those other claims, the Court also should deny summary judgment on the surety claim.

## X. Conclusion

The record reflects evidentiary conflicts regarding material matters surrounding the TASER deployment that gave rise to this case.  Such disputes make resolution of the federal excessive force claim(s) against Deputy Thomas and Sergeant Wensil dependent on fact-finding unavailable at the summary judgment stage.  Moreover, the parallel state law claim(s) require the same sorts of credibility determinations and evidence weighing.

**IT IS THEREFORE RECOMMENDED** that Defendants' Motion for Summary Judgment (Docket Entry 34) be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

June 15, 2012